John Burton, State Bar No. 86029
jb@johnburtonlaw.com
Ariana R.M. Gebauer, State Bar No. 292485
armgebauer@gmail.com
THE LAW OFFICES OF JOHN BURTON
4 East Holly Street, Suite 201
Pasadena, California  91103
Telephone: (626) 449-8300/Fax: (626) 449-8197

Michael J. Haddad, State Bar No. 189114
haddad.sherwin@sbcglobal.net
HADDAD & SHERWIN LLP
505 Seventeenth Street
Oakland, California  94612
Telephone: (510) 452-5500/Fax: (510) 452-5510

Attorneys for Plaintiffs Gary Martinovsky, M.D., and
Integrated Pain Care, Inc.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GARY MARTINOVSKY, M.D., and INTEGRATED PAIN CARE, INC., <br><br> Plaintiffs, <br><br> v. <br><br> COUNTY OF ALAMEDA, DISTRICT ATTORNEY NANCY E. O'MALLEY, in Her Official and Individual Capacities, DA INSPECTORS JOHN PAUL WILLIAMS and EDDIE BERMUDEZ, CALIFORNIA DEPARTMENT OF INSURANCE DETECTIVE FERNANDO CUBANGBANG, and DOES 1 to 20, <br><br> Defendants. | Case No.  3:16-CV-403 <br><br> **COMPLAINT FOR DAMAGES FOR VIOLATIONS OF CIVIL RIGHTS** <br><br> **DEMAND FOR JURY TRIAL** |

## JURISDICTION AND VENUE

1.     This case arises under 42 U.S.C. § 1983. Accordingly, subject matter jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 Fand 1343.

2.     Plaintiffs' claims arise out of conduct and events that took place in the counties of San Francisco, Alameda and Contra Costa, State of California, and therefore within this judicial district.

## THE PARTIES

3.     Plaintiff Gary Martinovsky, M.D., is an adult qualified to bring suit on his own behalf. Plaintiff Integrated Pain Care, Inc., is a California Corporation in good standing wholly owned by Dr. Martinovsky.

4.     Dr. Martinovsky graduated from the University of California, Berkeley, as a bachelor of science and from Stanford University as a medical doctor. He completed a residency in anesthesiology and acute care at Stanford School of Medicine, and a postgraduate fellowship in Pain Medicine at the University of California, Davis. Dr. Martinovsky holds board certification in Pain Medicine from the American Board of Anesthesiology. He is licensed in California as a physician in good standing, and aside from the events alleged below, he has no criminal or administrative history.

5.     Since May 2009, Plaintiffs have maintained an active pain medicine practice. During the relevant times, they operated, and continue to operate, a medical clinic at 3160 Garrity Way in San Pablo (the address is also given as Richmond), located in Contra Costa County, California. Plaintiffs employ multiple licensed physicians, physician assistants and nurse practitioners, among other specialists, to treat patients with painful medical conditions. Plaintiffs evaluate and treat numerous patients every week. About one-half of the patients present with work-related injuries, and their bills are paid, if at all, by insurance carriers through contracts and fee schedules under the California Workers' Compensation system. Since November 2009, Plaintiffs have had an ongoing contractual relationship with Farmers Insurance Company, through its intermediary CorVel Corporation, to treat injured workers covered by Farmers at rates 15 percent below the California Workers Compensation Fee Schedule.

6.     Plaintiffs strive to follow all state laws and professional standards in regards to all facets of their medical practice, including the dispensing of prescription

drugs, covered by the California Business & Professions Code, and the billing of insurance companies for sales and services. Plaintiffs did not and do not commit fraud or violate any law, and did not and do not conspire with others to do so.

7.     Defendant County of Alameda (County) is a political subdivisions of the State of California. Nancy O'Malley is the District Attorney (DA) for the County. DA O'Malley is sued in both her individual and official capacities as the relevant policy maker for and supervisor of the DA inspectors who, as alleged herein, acted on behalf of the County and the DA when investigating Plaintiffs for supposed improper sales of controlled substances and insurance fraud. In doing the acts herein alleged, DA O'Malley acted on behalf of the County, not the State of California, and therefore is not entitled to Eleventh-Amendment immunity.

8.     Defendants John Paul Williams and Eddie Bermudez are DA inspectors under DA O'Malley's supervision and are sued in their individual capacities only.

9.     Defendant Fernando Cubangbang is a detective for the California Department of Insurance (DOI), and is sued in his individual capacity only.

10.     Does 1 to 20 are unnamed because their identities have yet to be ascertained.

11.     At all material times, each Defendant was jointly engaged in wrongful activity, and was an integral participant to the events and violations of rights described below, resulting in the deprivation of Plaintiffs' constitutional rights and other harms.

12.     Each individually named defendant and each doe defendant acted under color of law and within the scope of his or her agency and employment with the County, the DOI, or some other state or local agency.

**RELEVANT FACTS**

**A.     Background of the Investigation**

13.     The State of California has established and regulates a Workers' Compensation system for the treatment and compensation of injured workers. Generally, employers purchase policies from insurance carriers which, either directly or

through intermediaries such as CorVel Corporation, contract with medical providers such as Plaintiffs to evaluate and treat injured workers. Workers who sustain work-related injuries have the option to retain counsel. Some do. Regardless, when a claim is presented, the carrier assigns a claim number and adjuster.

14. There are comprehensive payment schedules covering services, which are billed by "CPT codes," and separate schedules for pharmaceutical medications and over-the-counter products. Medical providers such as Plaintiffs use employees certified as billing and coding specialists to code and to bill properly. Insurance carriers employ batteries of sophisticated specialists to scrutinize bills and related medical records with the goal of minimizing payment to the medical providers, frequently "down coding" or disallowing charges altogether. There is constant interaction between billings and payments, with sophisticated actors on both sides. Because they control the money, however, the insurance carriers have more leverage than the medical providers.

15. Insurance carriers operating in California have used their vast financial resources to influence the DOI and various local entities such as the County and local officials such as the DA to target medical providers. The carriers' goal is to retain more of the money paid to them as workers' compensation insurance premiums by paying less out to medical providers, thus reducing injured workers' access to qualified medical providers other than for urgent care. As a result, the County DA participated with the DOI in operations targeting what they labeled, without any reasonable basis, "illegal medical mill operations." While in some cases unscrupulous medical providers might fabricate patients or otherwise bill for services not rendered or medications not dispensed, in other cases, including this one, lawfully operating clinics are targeted just because they provide medical treatment to and advocate for injured workers.

**B. Defendants Launch an Undercover Operation**

16. In August 2013, Defendant DOI Detective Fernando Cubangbang, and Defendant DA Inspector John Paul Williams fabricated an employer, "Bay Commercial Landscape," complete with an insurance policy from Farmers Insurance Company.

Defendant DA Inspector Eddie Bermudez, who actually had an injury, played the role of a Spanish-speaking landscape worker named Carlos Ramirez. An adjuster was assigned and a claim opened.

17. On September 11, 2013, Bermudez/Ramirez called "Centro Legal" and said he was injured on the job. Centro Legal, which has no relationship with Plaintiffs, apparently offered to arrange for legal representation. The next day Bermudez/Ramirez signed a retainer, and was provided a card for Rony Barsoum, an attorney in good standing with the State Bar of California. At that September 12 meeting, when Bermudez/Ramirez complained that he was in pain and needed immediate medical attention, he was told that medical treatment could be arranged through workers' compensation. Plaintiffs had no involvement in these events.

18. On September 26, 2013, Bermudez/Ramirez presented at the Bodner Chiropractic Professional Corporation in Hayward, California, for evaluation and treatment. Nika Bodner and Sohila Bodner are licensed chiropractors. Their clinic has no relationship with Plaintiffs other than that from time to time they refer patients who may need evaluation or treatment by a medical doctor specializing in pain.  The Bodner clinic evaluated and treated Bermudez/Ramirez, arranged for MRIs of the shoulder and knee, and referred the patient to an orthopedist. After approximately six weeks of chiropractic treatment, Bermudez/Ramirez reported he was not responding to the chiropractic treatments and physical therapy. Bermudez/Ramirez complained he was in severe pain and asked for pain medication that Dr. Bodner, a chiropractor, could not legally prescribe. Dr. Bodner appropriately declined to provide medications and instead referred Bermudez/Ramirez to Plaintiffs by requesting and obtaining an authorization from Farmers Insurance for pain management evaluation.

**C.    Defendants Make Three Undercover Visits to Plaintiffs' Clinic.**

19. On November 7, 2013, Bermudez/Ramirez presented at Plaintiffs' San Pablo clinic pretending to speak only Spanish. He was wearing a wire, and the encounter was monitored by Williams and Cubangbang. Unfortunately, the audio

quality of the recording is poor. The recording itself, and the summary of the visit in Williams' report, document an unremarkable first visit to a pain clinic by a patient presenting with a credible claim of a painful work-related injury.

20. After checking in with reception, Bermudez/Ramirez filled out a lengthy, detailed medical questionnaire with the assistance of a Spanish language interpreter. Bermudez/Ramirez reported injuries to his left shoulder, hip and knee, and moderate to severe around-the-clock pain–he called it a "7" on a 1 to 10 scale. Plaintiffs' medical assistant measured and charted the patient's height, weight and vital signs.

21. Dr. Martinovsky reviewed vital signs, medical questionnaire and medical records forwarded to him by the Bodner clinic. Dr. Martinovsky then interviewed and examined Bermudez/Ramirez with the assistance of an interpreter, as Dr. Martinovsky does not speak Spanish. Shortly after Dr. Martinovsky began the examination, a doctor working for an insurance company called Dr. Martinovsky's cell phone. Dr. Martinovsky politely excused himself and took the call, which required him to advocate for authorization of a medical procedure for another patient. When Dr. Martinovsky concluded the phone call he apologized and resumed his examination. Dr. Martinovsky manipulated the left upper extremity and took measurements of motion and strength, conducted a neurological examination of the left upper extremity, and examined the neck, appropriately charting his findings immediately following the evaluation. Bermudez/Ramirez told Dr. Martinovsky he had pain in his left shoulder, and that his MRI indicated a small tear in one of the tendons of his shoulder. Dr. Martinovsky told Bermudez/Ramirez that he could prescribe medication for the pain and that he would consider orthopedic referral following receipt and review of shoulder MRI, depending on MRI findings. Consistent with their policy to screen out drug abusers and to ensure patient safety when prescribing medications for pain Plaintiffs required Bermudez/Ramirez to provide a urine sample. To protect patient

privacy, the container was identified by barcode, not patient name.  Plaintiffs performed an in-office drug screen on the urine at that time, which was read as negative for all substances tested.

22.     Plaintiffs gave Bermudez/Ramirez the notice required by the California Business and Professions Code that the prescribed medications could be obtained from a pharmacy or obtained on site at the clinic. One employee provided Bermudez/ Ramirez non-prescription Terocin topical pain patches, an over-the-counter medication, explaining that the prescription medications had to be provided by someone else. After a short wait, another employee, a properly licensed physician's assistant, provided Bermudez/Ramirez with the prescription medications, Tramadol (Ultram) ER, Omeprazole, and Naproxen, none of which was a controlled substance. The required instructions and warnings in both English and Spanish were stapled to the bag of medications and were clearly spelled out on the properly labeled medication bottles, as required by the Business & Professions Code.

23.     Dr. Martinovsky timely prepared a seven-page report accurately summarizing the answers given on the questionnaire and the results of his own examination, and detailing his complex decision making process. The report was submitted to Farmers Insurance with the request for approval of the medications. On November 20, 2013, CorVel Corporation certified on behalf of Farmers Insurance that the prescription medications were necessary and appropriate.

24.     On December 5, 2013, Bermudez/Ramirez appeared for a follow-up appointment at Plaintiffs' clinic. Again he wore a wire. This time Bermudez/Ramirez spoke broken English rather than Spanish, so no interpreter was used, but resulting language issues added confusion to the visit. Bermudez/Ramirez was seen by Plaintiffs' licensed physician's assistant Frederick Curtis. Bermudez/Ramirez told Mr. Curtis that he had been taking some unspecified medication provided by a friend to control his pain. Mr. Curtis said that was very dangerous, he should not be doing that, and that while in pain he should be taking the prescribed medications as directed. Mr. Curtis

lawfully renewed the prescriptions, which were dispensed to Bermudez/Ramirez in the manner required by the Business & Professions Code.

25. On January 16, 2014, Bermudez/Ramirez presented himself to Plaintiffs' clinic for a final appointment, and reported himself as pain free to Mr. Curtis. Apparently, there was no wire worn or recording made of this visit.

26. Dr. Martinovsky did not interact with Bermudez/Ramirez during either of his final two visits.

27. Plaintiffs' certified billing and coding employee billed for the evaluation and treatment of Bermudez/Ramirez, although not for the in-office urine test. Farmers Insurance Company paid $811.99 for the medications actually dispensed, and another $189.85 for all services rendered to Bermudez/Ramirez during the three visits. Farmers Insurance down coded CPT codes submitted, failed to reimburse Plaintiffs for review of the knee MRI, intake questionnaire, Dr. Bodner's report, the 7-page   report by Dr. Martinovsky, and the billing code submitted for increased complexity due to utilization of an interpreter, all billable CPT codes under the California Workers Compensation Fee Schedule. Farmers reimbursed the medications at prices significantly below California Workers Compensation Fee Schedule, and failed to reimburse Plaintiffs for the Terocin topical patches. The insurance carrier's failure to pay the total amount due is not uncommon in Plaintiffs' experience.

28. Defendants made no attempt to contact Plaintiffs to clarify any questions about the foregoing facts. Instead, they decided to arrest Dr. Martinovsky and raid the clinic for alleged felony drug and insurance-fraud offenses based on the foregoing.

**D.     Williams' False and Misleading Probable Cause Declaration**

29. Based on this palty investigation which yielded no evidence of wrongdoing on the part of Plaintiffs, Defendant Williams, in collaboration with Defendants Cubangbang and Bermudez, prepared a "Probable Cause Declaration" in support of warrants for Dr. Martinovsky's arrest and for a search of Plaintiffs' premises. No law enforcement officer exercising reasonable professional judgment would have believed

that probable cause existed to apply for a warrant based solely on three undercover visits that revealed a functioning medical clinic servicing patients with work related injuries pursuant to law and the professional standards of workers compensation.

30. The warrant application violated the Fourth Amendment as Williams, Cubangbang and Bermudez deliberately and recklessly included falsehoods and omitted material facts. With the deliberate and reckless falsehoods deleted, and the material omissions included, the warrant does not provide a scintilla of probable cause for Dr. Martinovsky's arrest or for the search of Plaintiffs' medical clinic. These material falsehoods and omissions include, but are not limited to, the following:

(a) The probable cause declaration states: "I immediately recognized the name of [attorney] Rony Barsoum as a suspect who participated in illegal insurance fraud activity." That statement is false and misleading. Mr. Barsoum is a partner in the firm Reyes & Barsoum LLP, which represents injured workers, among other clients. According to the State Bar of California website, Mr. Barsoum has no history of discipline.

(b) The probable cause declaration states: "Bermudez was directed to place a urine sample in an unmarked plastic cup." That statement is false. The cup was marked with a bar code that matched to a code included in the medical chart. The cup had built in chemical strips that change color if the urine contains common drugs of abuse. Names cannot be used on the cups to protect patient privacy.

(c) The probable cause declaration states: "The unknown woman wordlessly handed Bermudez two boxes of 'Terocin' topical pain patches. No explanation about the use of the prescription medication was given. Neither box contained the name of Carlos Ramirez." That statement is false and misleading. Terocin is an over-the-counter medication, not a prescription medication. The boxes had detailed use instructions and warnings.

(d)    The probable cause declaration states: "Bermudez heard his undercover name called out by an unknown male. Bermudez met the subject who wordlessly handed him a white paper bag containing three pill bottles. The subject never told Bermudez what the drugs were or how to use them." That statement is false and misleading. The prescription drugs were properly packaged and labeled with instructions. A sheet with detailed warnings was stapled to the bag. They were dispensed by a licensed physician's assistant (PA) as authorized by the Business & Professions Code.

(e)    The probable cause declaration states that "Tramadol" is "a schedule IV dangerous drug." That statement is false. At the time of the warrant, Tramadol was not scheduled by either the DEA or California. (The DEA added it to Schedule IV effective August 18, 2014.) Tramadol is a relatively mild non-narcotic pain reliever. The FDA approves Tramadol for treatment of moderate to severe pain. While it has a low potential for abuse, it is even more difficult to abuse in its time-release form. This prescription was conservative: 30 time-release doses to be taken once a day, the supply to last one month, until the next appointment. The Tramadol was prescribed to give immediate relief to a patient who reported constant pain at a level 7, for whom chiropractic treatments had provided no relief, and who reported that an MRI revealed a small tear.

(f)    The probable cause declaration states that "[Dr.] Martinovsky[] fail[ed] to review the documentation completed by Bermudez." That statement is false. Dr. Martinovsky used the responses provided by Bermudez/Ramirez's medical history questionnaire in his report. Dr. Martinovsky also reviewed Bermudez/ Ramirez knee MRI as well as Dr. Bodner's follow-up report.

(g)    The probable cause declaration states that "Martinovsky prescribed medication for Bermudez after asking him about the results of his MRI, although he did not review the MRI himself." That statement is misleading. Neither the patient nor the referring chiropractor provided Plaintiff the shoulder MRI

results. Dr. Martinovsky did review the MRI of the knee, which was provided by Dr. Bodner's office. The patient presented in immediate need of pain relief. The medications would have been appropriate even if there were no MRI taken.

(h)　　The probable cause declaration states: "During the alleged treatment phase of the visit with Martinovsky, the doctor took a telephone call just after entering the examination room. The call was not an emergency and sounded as if it was a cross between a business and personal call." That statement is false and misleading. Dr. Martinovsky can be heard on tape discussing MRI findings for another patient with a doctor working for insurance company, and explained that to Bermudez/Ramirez upon completion of the call, apologizing for the interruption.

(i)　　The probable cause declaration states,  in reference to Dr. Martinovsky asking Bermudez/Ramirez to clarify who represents him: "medical doctors, who run the type of medical mills operated by Martinovsky, are always concerned about their patient's legal representation as they believe payment is secured once the patient is represented by a member of the conspiracy."  That statement is false and misleading. This patient already had an insurance claim number and adjuster assigned. Frequently patients are unrepresented by counsel. Doctors are required to send reports to attorneys as well as carriers. There was a discrepancy in this patent's chart regarding the identity of his attorney, prompting the question. Regardless, Williams had no evidence that Dr. Martinovsky was involved in a "conspiracy."

(j)　　The probable cause declaration states that "Bermudez was handed the prescription medications by two different subjects. Neither subject appeared to be a pharmacist or registered nurse. Neither subject said a word regarding the type of drug dispensed nor the manner in which it was to be taken." That statement is false and misleading in multiple respects. The patches were not prescription medications, and all the prescription medications were handed to Bermudez/Ramirez by a licensed physician's assistant, as authorized by the Business & Professions Code,

which does not require that a pharmacist dispense prescribed medications at a doctor's office. The instructions were on the packaging and the bottles.

(k)     The probable cause declaration states that "The cavalier attitude towards dispensing was further demonstrated by the ease in which an admitted drug addict, [name not included here to protect patient privacy], was able to enter the practice and obtain drugs for his addiction. If Martinovsky was in fact monitoring his patient's drug use via urine samples, then he would have to know that [name] was abusing the drugs he was dispensing." That statement is fabricated out of thin air. First, there is nothing to indicate Defendants' contention of a "cavalier attitude toward dispensing" of prescription medications in the probable cause declaration. Everything that happened during the first and second undercover visits was by the book. More significantly, Williams had no evidence that the patient with whom Bermudez/Ramirez apparently spoke while in Plaintiffs' waiting room, was either an "addict" or a patient who obtained "drugs for his addiction" from Plaintiffs. Defendants could not know whether the patient required a urine test or would have tested positive in a urine sample. In fact that particular patient had been prescribed Vicodin (a schedule II controlled substance) prior to the transfer of his care to Plaintiffs. Dr. Martinovsky discontinued Vicodin on the first visit, which took place prior to the first visit of Bermudez/Ramirez. Dr. Martinovsky did not prescribe any "drugs of addiction" at subsequent visits.

(l)     The probable cause declaration states that "the medical doctors in this conspiracy were eager to take patients away from fellow co-conspirators if there was money to be made." That statement is false and misleading, not to mention internally inconsistent and somewhat incomprehensible. Williams had no basis to assert that Dr. Martinovsky was engaged in a conspiracy with anyone, and in fact there was no conspiracy, nor any evidence of conspiracy cited in the probable cause declaration, involving Plaintiffs with any of the other people or entities

mentioned in the probable cause declaration. Medically, there were different specialities involved in the patient's treatment, so different providers offered different services at different stages.

(m)     The probable cause declaration states: "As in all of our previous undercover visits with all of the doctors involved in this criminal conspiracy, Bermudez had a recording/broadcast device secreted on his person." That statement is false and misleading. Williams had no basis to assert that Dr. Martinovsky was engaged in a conspiracy with any other medical doctor, and in fact there was no conspiracy. Incidentally, Bermudez/Ramirez was not wired for his third, final visit to Plaintiffs' clinic.

(n)     The probable cause declaration states: "Bermudez was eventually called into an exam room where he was met by a Physicians Assistant (PA) identified as Frederick [Curtis]. During the contact Frederick asked Bermudez how much pain he was in. Bermudez told him he was okay and that he did not have any pain." Williams added: "As with Dr. Martinovsky, it was clear to me that N/P Frederick was clearly a co-conspirator in the medical mill operation. Frederick prescribed drugs for a patient who essentially stated he was not hurt. Frederick went out of his way to get Bermudez to state that he was hurt when he advised that he was not." These statements are false and misleading. There is an audio recording of this conversation. PA Frederick Curtis kept asking about pain because Bermudez/Ramirez, who was speaking pseudo-broken English, would not give Mr. Curtis a straight answer on whether his reduction in pain was due to medications.  At the end Bermudez/Ramirez indicated that his pain diminished while taking medications prescribed, and that he ran out of his medications three days before this visit. Williams left out entirely the "entrapping" fact that Bermudez/Ramirez told Mr. Curtis that he was taking some unidentified prescription medication for the pain that someone had given him. Mr. Curtis counseled him strongly about the health risks of doing so and told him to stop.

Mr. Curtis renewed the prescription for medications prescribed by Dr. Martinovsky based on the above and to keep the patient from using something illicit or more dangerous for pain relief.

(o) The probable cause declaration states: "Frederick had failed to place his name on the prescription bottles as the prescribing medical practitioner. Even if Frederick was working at Martinovsky's direction, he would have to provide his name as the responsible prescribing party." That statement is false and misleading. Because the medications were dispensed at the clinic, the appropriate name on the bottle was Dr. Martinovsky's. The chart accurately reflected that Bermudez/Ramirez saw Mr. Curtis rather than Dr. Martinovsky. The medications were dispensed properly under the Business & Professions Code.

(p) The probable cause declaration states: "In review of the bills from Martinovsky's office I noted the following fraudulently documented CPT codes for services never rendered. The first was CPT code 99245." That statement is false. Dr. Martinovsky conducted a complex initial examination of the patient, documented in his seven-page report. Pursuant to generally accepted billing standards for the medical profession and workers compensation, Plaintiffs' certified billing specialist appropriately listed the services rendered under CPT 99245. Dr. Martinovsky did not indicate that he was billing CPT code 99245 based on time he spent face to face with Bermudez/Ramirez. He instead stated the following in his report to the insurance carrier: "In accordance with OMFS Guidelines this report is submitted using RBRVS codes 99245-93, high complexity evaluation of the injured worker with assistance of an interpreter, 99358 to reflect 15 minutes for record review and 99080 x 7 to reflect 7 pages used." The vast majority of medical office visits in the United States are similarly coded based on Complexity Factors/Clinical Circumstances of the evaluation, not by direct face-to-face physician time. Complexity Factors are published by the American Medical Association and the California Medical Association. The

propriety of the billing cannot be determined without reference to Complexity Factors. These were deliberately or recklessly omitted by Williams, who subsequently testified he knew nothing about them and was unaware of the point system provided by the American Medical Association to appropriately code high complexity decision making. In any event, Farmers Insurance was fully informed of the circumstances underlying the charge, elected to down code the charge by one level to CPT 99244, and then further reduced the amount pursuant to the contract with Plaintiffs before paying $137.60 for the service.

(q)     The probable cause declaration states: "Martinovsky charged $400.00 for his services." This statement is false. The $400 is listed on the bill as a reasonable and customary charge, but the actual charge for a CPT 99245 is set by Workers' Compensation schedules, and then is discounted pursuant to the CorVel Corporation contract with Plaintiffs. Moreover, the carrier down coded. Ultimately, for the examination, which in fact took place as described in the documentation submitted, Plaintiffs were paid $137.60.

(r)     The probable cause declaration states: "The submission of payment to Farmers Insurance Company denoting CPT Codes 99080 and 99358 is in fact a fraudulent misrepresentation completed by Martinovsky for the sole purpose of defrauding the insurance industry." This statement is false. CPT Code 99080 was appropriately billed for each page of the 7-page consultation report Dr. Martinovsky prepared. CPT Code 99358 was appropriately billed for 15 minutes of record review without direct face-to-face contact, which included review of the intake medical questionnaire, the MRI of the knee, Dr. Bodner's report, and the authorization form by insurance. These codes were selected by certified billing specialists, based on and allowed by the Workers Compensation Fee Schedule. Farmers Insurance did not reimburse Dr. Martinovsky for these codes even though the services were rendered.

- 15 -

(s)     The probable cause declaration states: "In further review of the bills submitted by Martinovsky I noted that he listed CPT code 99070 four times. The services rendered by Martinovsky were almost non-existent and certainly did not rise to the level of services billed for. Per the AMA 99070 is for services provided above those usually included in an office visit." That statement is false. CPT Code 99070 is used to account for dispensing of medications under Workers Compensation Official Medical Fee Schedule, and was billed four times to account for the four medications dispensed.

(t)     The probable cause declaration states: "I know that the signed medical report that Martinovsky sent to Farmers Insurance Company for payment in the amount of $2,283.00 for the nine and one half minutes of treatment, is in fact false." This statement is in fact false. The $2,283.00 is the total of reasonable and customary fees for the services rendered *and* the the prescription medications actually dispensed. (There were two other small, separate billings, neither of which was paid.) Farmers Insurance Company pays pursuant to the workers compensation schedule and the CorVel Corporation contract amounts that are significantly less than the reasonable and customary charges stated on Plaintiffs' billing. After down coding and disallowing charges in Plaintiffs' billings for the evaluation and treatment of Bermudez/Ramirez, Farmers Insurance Company paid a total of $1,001.84, broken down into payments of $811.99 for the prescription medications actually dispensed and $189.85 for services rendered during three office visits.

(u)     The probable cause declaration states: "On 2/26/14 I went to the Walgreens Pharmacy . . . in the city of San Leandro. I contacted Pharmacist Jim Wang. I identified myself and asked him to provide me with the prices of the four drugs listed above. Wang quoted the following prices a subject would pay for each drug if they had no insurance. Tramadol/50mg-60- $26.79, Naproxen/550mg-60-$43.99, Omeprazole/20mg-30-$24.63, Lidocaine patch 5%

$290.00 per box. The total Martinovsky charged was $1,645.02. For what could be considered close to identical, Walgreens charges $675.41. Martinovsky's prices are approximately 240% higher than Walgreens. Martinovsky charged Farmers Insurance a total of $1,645.02 for the four medications his staff dispensed." That statement is false and misleading. Dr. Martinovsky's office appropriately requested and obtained authorization from Farmers Insurance for the prescription medications provided. Reimbursement for each medication is based on the unique National Drug Code (NDC) assigned and is published on the California Department of Workers Compensation website. Medications dispensed by Plaintiffs were in different formulations, with different NDC numbers, than the ones Williams is quoting from Walgreens. For example, the Tramadol prescribed by Dr. Martinovsky was listed at 150 mg dosage in extended release formulation, appropriate for a patient complaining of around-the-clock pain, versus the 50 mg immediate release short acting Tramadol formulation for which Williams obtained a quote at Walgreens. The billing lists usual and customary charges, but the price is actually set by the Official Medical Fee Schedule published by California Department of Workers Compensation, as modified by the CorVel contract. Williams later testified that he did not check the Official Medical Fee Schedule prior to submitting the affidavit of probable cause. In fact he stated that he has never seen it. The medications were accurately listed with NDC numbers clearly stated on the medication bottles and forwarded to Farmers Insurance with billing pursuant to all applicable laws. Farmers Insurance approved the prescriptions and paid some at the scheduled prices and some payments below scheduled prices. Farmers Insurance did not pay for the Terocin patches. The total reimbursement for all medications dispensed to the patient was $811.99, about 20 percent higher than the Walgreens estimate.

31. When the falsehoods are deleted, and the relevant background added, what Williams' probable cause declaration describes, as relates to Plaintiffs, is a busy

medical doctor and medical clinic functioning within the legal milieu of California's Workers' Compensation system and the California Business & Professions Code. Calling something a "conspiracy" does not make it one.

32. Because of the deliberately and recklessly false and misleading statements, and omissions of material facts in the probable cause declaration submitted by Defendants, on March 13, 2014, the Alameda Superior Court issued warrants for the arrest of Dr. Martinovsky and for the search of Plaintiffs' clinic.

**E.     The Arrest and the Search**

33. On Thursday, March 20, 2014, after 8:00 a.m., Dr. Martinovsky left his San Francisco home with his two young children to drop them off at school on his way to work. He had no way to know he was the target of an investigation. After dropping one child off, Dr. Martinovsky was pulled over by numerous officers, including Williams and Cubangbang. Williams ordered Dr. Martinovsky out of the car, gave *Miranda* admonitions and asked whether he wanted to "give a statement, chat with us." Dr. Martinovsky stated that he wanted to know what was going on. Williams said that based on his undercover operation, Dr. Martinovsky billed for "a substantial amount of medical services" that were never rendered and provided "controlled substances illegally." Dr. Martinovsky responded, accurately: "Everything I do is by the law."

34. Faced with Dr. Martinovsky's measured and truthful denials of wrongdoing, Williams ranted: "You're running a very large, multi-practice criminal organization in which . . . people sell patients to you for money, and then you treat those patients, allegedly, and then bill the insurance companies for tens of thousands of dollars for services you never did." "You use people like sheep and charge the insurance industry tens of thousands of dollars for services you never gave." "You and the people that conspire with you are going to be going to jail." "We're going to do everything we can to take your medical license away from you, which I'm sure we will, and do everything we can to put you out of business."

35. Dr. Martinovsky's wife was summoned to pick up the child. Dr. Martinovsky was handcuffed, put into a law enforcement vehicle and taken to Alameda County Jail, where he was booked on multiple drug and insurance-fraud charges. Dr. Martinovsky was released on $71,000 bail after 10 hours in custody.

36. Meanwhile, Defendants raided Plaintiffs' medical clinic while it was open for business, full of patients and employees. Patients were sent away and employees interrogated. Defendants defamed Dr. Martinovsky to his employees. Citing a few examples that wound up recorded, Williams said: "We've got Dr. Martinovsky cold. It's over with. He's in jail." "Validated" gang members come to the clinic for prescriptions for drugs, "reselling those drugs, and doing it on a fairly regular basis." "There's a scam going on here." "This is a criminal enterprise and everyone who works here is a co-conspirator." "Everything Dr. Martinovsky does is criminal." "There's people that come in here and sell cases." Williams told a nurse practitioner: "You function in a doctor's office where 99 percent of the people come in and get drugs," " I consider medications your office dispenses to patients garbage," and "There is a parallel investigation with the Feds for medicare fraud."

**F.  Plaintiffs' Injuries and Compensable Damages**

37. Because of the search of the clinic, and the defamatory statements made by Defendants, word spread quickly through the regional medical community, legal professionals and insurance industry that Dr. Martinovsky had been arrested and charged with felony drug and insurance fraud charges. The effect was immediate and devastating for Plaintiffs' otherwise spotless reputation and growing medical practice, and caused severe emotional distress.

38. As a result of the arrest, the California Medical Board, with the support of the County DA, sought to suspend Dr. Martinovsky's medical license, but the motion was denied.

39. Ultimately the DA's case against Dr. Martinovsky in Alameda County was dismissed on venue grounds. A single felony count for violating Cal. Penal Code

§ 550(a)(7) (knowingly submitting a claim for a health care benefit not used by, or on behalf of, the claimant) was filed in Contra Costa County Superior Court. During the preliminary hearing, which was not completed, the charge was reduced to a misdemeanor and is scheduled to be dismissed later this year pursuant to a pre-plea misdemeanor diversion order.

40. Plaintiffs have struggled through the difficulties caused by Defendants actions, which cost them key employees and innumerable professional and business opportunities. The clinic has remained open, however, and Plaintiffs continue to treat their patients, including many injured workers. Plaintiffs follow the same policies and procedures in treating patients, dispensing medications, and billing and coding today that were in place during the undercover operation.

41. As a direct and proximate result of the aforesaid acts and omissions, and the customs, practices, policies and decisions of the Defendants alleged in this complaint, Plaintiff Martinovsky suffered the humiliation of being falsely arrested in front of his wife and child. The charges, especially the drug related counts, caused him injury in his reputation, health and person. He suffered and will continue to suffer great emotional, mental and physical pain, suffering, anguish, fright, nervousness, anxiety, shock, humiliation, indignity, embarrassment, harm to reputation, and apprehension, which have caused, and will continue to cause, Plaintiff Martinovsky to sustain general damages in a sum to be determined at trial.

42. As a further direct and proximate result of the aforesaid acts, omissions, customs, practices, policies and decisions of the defendants, Plaintiffs suffered past and future losses of income which have caused Plaintiffs to sustain economic damages in a sum to be determined at trial.

43. As a further direct and proximate result of the aforesaid acts, omissions, customs, practices, policies and decisions of the defendants, Plaintiffs incurred legal, medical and other expenses, and will incur future medical and other expenses, which have caused Plaintiffs to sustain damages in a sum to be determined at trial.

44.   Plaintiff Martinovsky now has a professionally damaging criminal history consisting of this arrest for multiple felonies, including drug offenses.

## FIRST CLAIM FOR RELIEF

### Deprivation of Civil Rights – 42 U.S.C. § 1983

### Individual Liability

45.   Defendants, while acting under color of law, deprived Plaintiffs of rights secured under the Fourth and Fourteenth Amendments to the United States Constitution, including, but not limited to, each of the following particulars:

(a)   Submitting an application for arrest and search warrants for Plaintiffs without exercising reasonable judgment that probable cause existed;

(b)   Deliberately and recklessly including falsehoods and omitting material facts that compromised the judgment of the issuing magistrate;

(c)   Preparing false reports and lying to the prosecuting attorneys to cause the filing of false and malicious criminal charges, including specious drug offenses, against Dr. Martinovsky;

(d)   Arresting Dr. Martinovsky without a valid warrant or probable cause;

(e)   Searching Plaintiffs' medical clinic without a valid warrant or probable cause and in an unreasonable manner;

(f)   Defaming Plaintiffs following the illegal arrest and search ("Defamation Plus"); and

(g)   Causing Plaintiff to be prosecuted, and to have to undergo a license suspension hearing, based on falsified reports and evidence.

46.   The above acts and omissions, carried out under color of law, have no justification, and constitute a gross abuse of governmental authority and power, shock the conscience, are fundamentally unfair, arbitrary and oppressive, and unrelated to any activity in which governmental officers may appropriately and legally undertake in the course of protecting persons or property, or ensuring civil order. The above acts and omissions were consciously chosen from among various alternatives.

- 21 -

47.    As a direct and proximate result of the aforesaid acts, omissions, customs, practices, policies and decisions of the aforementioned defendants, Plaintiffs were damaged as alleged above.

48.    The above mentioned individually named and Doe defendants, acted under color of law, and both separately and in concert. The aforementioned acts of those defendants, and each of them, were willful, wanton, malicious and oppressive, with reckless disregard or with deliberate indifference and with the intent to deprive Dr. Martinovsky and his corporation of their constitutional rights and privileges, and did in fact violate the aforementioned rights and privileges, entitling Plaintiffs to exemplary and punitive damages in an amount to be proven at the trial of this matter.

## SECOND CLAIM FOR RELIEF

### Deprivation of Civil Rights – 42 U.S.C. § 1983

### Entity and Supervisory Liability

(Against Defendants County and DA O'Malley)

49.    In their supervision of so-called insurance fraud investigations against purported medical "mills" – clinics that service people who are making claims against insurance carriers – Defendants County of Alameda and District Attorney O'Malley have been compromised by political pressure and donations from insurance carriers. They do not treat both sides equally, but instead side with the insurance industry. In doing so, they act with deliberate indifference, and in conscious and reckless disregard to the safety, security and constitutional and statutory rights of Plaintiffs, including the right to be free from unreasonable searches and seizures under the Fourth Amendment, and the right to procedural and substantive due process and equal protection under the Fourteenth Amendment.

50.    Defendants County and DA O'Malley have maintained, enforced, tolerated, ratified, permitted, acquiesced in, and/or applied, policies of allowing investigators like J.P. Williams, who lacks expertise in medicine, workers compensation and insurance, to submit warrants and make arrests based on technical issues involving

professional standards of care, among others, and allowed constitutional violations as alleged herein.

51.    As a supervisor, DA O'Malley has set into motion, or failed to stop, a series of acts that caused the constitutional violations alleged herein. In particular, she or her subordinates allowed a busy doctor to be arrested on multiple, unprovable and wildly exaggerated felony charges, and for a clinic that treats hundreds of patients to be raided, abruptly disrupting the operations of a busy medical clinic, full of medical professionals and patients in need of medical care.

52.    As a direct and proximate result of the aforesaid acts, omissions, customs, practices, policies and decisions of the aforementioned defendants, Plaintiffs were injured as alleged above.

## PRAYER

WHEREFORE, Plaintiffs request relief as follows, and according to proof, against each defendant:

1.    General and compensatory damages in an amount according to proof;

2.    Special damages in an amount according to proof;

3.    Exemplary and punitive damages against each individual and Doe defendant, not against the County of Alameda or the County of Alameda District Attorney in her official capacity, in an amount according to proof;

4.    Costs of suit, including attorneys' fees, under 42 U.S.C. § 1988; and,

5.    Such other relief as may be warranted or as is just and proper.

Dated:    January 20, 2016        THE LAW OFFICES OF JOHN BURTON
                                  HADDAD & SHERWIN


                                  By:    /S/ John Burton
                                         _____
                                         John Burton
                                         Attorneys for Plaintiffs

- 23 -

**DEMAND FOR JURY TRIAL**

Plaintiffs demands trial by jury.

Dated:   January 20, 2016      THE LAW OFFICES OF JOHN BURTON
                               HADDAD & SHERWIN

                                           /S/ John Burton
                        By:   _____
                                      John Burton
                                 Attorneys for Plaintiffs