United States District Court
Northern District of California

1

2

3

4          IN THE UNITED STATES DISTRICT COURT

5        FOR THE NORTHERN DISTRICT OF CALIFORNIA

6

7    GARY MARTINOVSKY, et al.,              Case No. 16-cv-00403-MMC

8            Plaintiffs,

9       v.                                 **ORDER GRANTING IN PART AND
                                            DENYING IN PART DEFENDANTS'
10                                          MOTIONS TO DISMISS PLAINTIFFS'
     COUNTY OF ALAMEDA, et al.,             FIRST AMENDED COMPLAINT**

11           Defendants.                    Re: Dkt. Nos. 46, 47

12

13          Before the Court are two motions, brought pursuant to Rules 12(b)(6) and 12(e) of

14   the Federal Rules of Civil Procedure, to dismiss plaintiffs' First Amended Complaint

15   ("FAC"), the first said motion, filed July 25, 2016, by defendants County of Alameda (the

16   "County"), Nancy O'Malley ("O'Malley"), John Paul Williams ("Williams"), and Eddie

17   Bermudez ("Bermudez") (collectively, "County defendants"), and the second, likewise

18   filed July 25, 2016, by defendant Fernando Cubangbang ("Cubangbang").  Plaintiffs Gary

19   Martinovsky ("Martinovsky") and Integrated Pain Care, Inc. ("IPC") have filed opposition,

20   to which County defendants have replied.

21          Having read and considered the papers filed in support of and in opposition to the

22   motions, the Court rules as follows.

23                              **BACKGROUND**[1]

24   **A.    The Parties**

25          Martinovsky is a medical doctor licensed to practice in the state of California.  IPC

26   is a California corporation wholly owned by Martinovsky.  At all relevant times, plaintiffs

27   _____

28          [1] The following facts are taken from the FAC, filed June 24, 2016.

have maintained a pain medicine practice at a medical clinic they operate in Contra Costa County and have had a contract with Farmers Insurance Company ("Farmers") to provide medical services and dispense medications to injured workers at rates below the applicable state workers' compensation payment schedules.

O'Malley is the District Attorney ("DA") for the County of Alameda.  Williams and Bermudez are DA Inspectors under O'Malley's supervision.  Cubangbang is a detective employed by the California Department of Insurance ("DOI").[2]  Each said defendant is sued solely in his/her individual capacity.[3]

**B.    The Events**

The instant case arises from a workers' compensation sting operation conducted by Williams, Cubangbang, and Bermudez.  In particular, in August 2013, Williams and Cubangbang "fabricated" an injured employee of a fictitious employer purportedly insured by Farmers, and thereafter opened a fictitious workers' compensation claim for said fictitious worker.  (See FAC ¶ 25.)  In the course of the operation, Bermudez, who played the role of the worker, and who actually had a shoulder injury, visited a chiropractic clinic, which, inter alia, arranged for an MRI of his shoulder and, after he asked for pain medication, referred him to plaintiffs.

On November 7, 2013, Bermudez, wearing a wire monitored by Williams and Cubangbang, went to plaintiffs' clinic (the "first visit").  With the assistance of an interpreter, Bermudez filled out a questionnaire in which he reported injuries to his left shoulder, hip, and knee and rated his pain as "7" on a scale of 1–10.  (See id. ¶ 32.) Martinovsky reviewed the questionnaire, Bermudez's vital signs, and medical records

---

[2] In addition to the County and the above-named individual defendants, plaintiffs have sued twenty "Doe" defendants.  As no challenge has been brought on behalf of any of the Doe defendants, the Court does not address herein the sufficiency of the claims brought against them.

[3] Although the caption of the FAC states O'Malley is sued "in [h]er [o]fficial and [i]ndividual [c]apacities" (see id. at 1), the Court, in a prior order, dismissed the complaint without leave to amend to the extent it was brought against O'Malley in her official capacity (see Order, filed May 20, 2016, at 2 ("May 20 Order")).

1   from the chiropractic clinic,[4] after which he, with the interpreter's assistance, interviewed

2   and examined Bermudez, who stated he had pain in his shoulder and that an MRI of his

3   shoulder had revealed a torn tendon.  Martinovsky told Bermudez he could prescribe

4   medication for the pain, and, after a drug screen, one of plaintiffs' employees gave

5   Bermudez non-prescription pain patches and another provided him with three

6   prescription medications.

7       Subsequently, Martinovsky prepared a report as to the first visit, characterizing his

8   examination of Bermudez as a "high complexity evaluation . . . with assistance of an

9   interpreter," and billing said examination under Current Procedural Terminology ("CPT")

10  code 99245.  (See id. ¶ 47(g).)  On December 3, 2013, plaintiffs, using a "certified billing

11  and coding employee" (see id. ¶ 40), billed Farmers for the first visit, including for

12  services rendered and medications dispensed.  Farmers did not pay the total amount

13  billed, as it "disallowed" the CPT 99245 high-complexity billing code (see id. ¶ 41) and

14  "down code[d] the charge by one level to CPT 99244" (see id. ¶ 47(g)).

15      On December 5, 2013, Bermudez, again wearing a wire monitored by Williams

16  and Cubangbang, visited plaintiffs' clinic (the "second visit"), where he was seen by

17  Frederick Curtis ("Curtis"), Martinovsky's physician assistant ("PA").  Bermudez told

18  Curtis he had been taking an unspecified medication to control his pain, and Curtis

19  directed him to stop doing so and renewed "the prescriptions."  (See id. ¶ 37.)

20  Martinovsky "did not interact with" Bermudez during the visit.  (See id. ¶ 39.)  On

21  December 23, 2013, plaintiffs billed Farmers for the second visit.

22      On January 16, 2014, Bermudez, this time without a wire, made his final visit to

23  plaintiffs' clinic (the "third visit"), where he was seen by Curtis and "reported himself as

24  pain free."  (See id. ¶ 38.)  As with the second visit, Martinovsky "did not interact with"

25  Bermudez.  (See id. ¶ 39.)  On February 18, 2014, plaintiffs billed Farmers for the third

26  visit, which bill Farmers did not pay.

27  _____

28      [4] Those records did not include the shoulder MRI.

3

United States District Court
Northern District of California

On March 13, 2014, Williams and Erin Loback, a Deputy DA for the County, swore to a warrant and criminal complaint against Martinovsky and Curtis, alleging therein unlawful dispensing of drugs, in violation of § 4170 of the California Business & Professions Code, and insurance fraud, in violation of §§ 550(a)(7) and (b)(1) of the California Penal Code (the "Alameda case").[5]  (See FAC ¶ 43 & Ex. A ("Walk Warrant").)[6] In particular, the Walk Warrant charged Martinovsky with six "Counts": (1) a violation of § 4170, in connection with the first visit, for "unlawfully dispens[ing] drugs to patients in his office" ("First Count"); (2) a violation of § 550(a)(7), in connection with the first visit, for "knowingly submit[ting] a claim for a health care benefit which was not used by, or on behalf of, the claimant" ("Second Count"); (3) a violation of § 550(b)(1), in connection with the second visit, for "present[ing] and caus[ing] to be presented a written and oral statement as part of, and in support and opposition to, a claim for payment and other benefit to an insurance policy, knowing that the statement contained false and misleading information containing a material fact" ("Third Count"); (4) a violation of § 550(a)(7), in connection with the second visit, on the same basis as the Second Count ("Fourth Count"); (5) a violation of § 550(b)(1), in connection with the third visit, on the same basis as the Third Count ("Sixth Count"); and (6) a violation of § 550(a)(7), in connection with the third visit, on the same basis as the Second Count ("Seventh Count").  (See Walk Warr. at 1–2.)  In the same Walk Warrant, Curtis was charged with five "Counts": the Third, Fourth, Sixth, and Seventh Counts as described above, and one count alleging a violation of § 4170, in connection with the second visit, for "unlawfully dispens[ing] drugs to patients in his office" ("Fifth Count").  (See id.)

Additionally, on March 13, 2014, "[d]efendants" submitted a declaration (see id.

_____

[5] The warrant does not specify, with respect to the § 4170 charge, the particular subsection(s) plaintiffs were accused of violating, nor does it identify, with respect to any of the charges, the particular conduct underlying the charge.

[6] Although the document attached to and referenced in the FAC as Exhibit A does not include a warrant (see id. at 2), it bears the titles "Complaint" and "Walk Warrant" (see id. at 1) and is cited by plaintiffs as the "Walk Warrant" (see FAC ¶ 43).

United States District Court
Northern District of California

¶ 50 & Ex. B ("PC Declaration")),[7] prepared and signed by Williams in support of warrants for the arrest of Martinovsky and a search of plaintiffs' clinic.  According to plaintiffs, the PC Declaration contained "deliberately and recklessly false and misleading statements, and omissions of material facts," as a result of which misrepresentations and omissions the court issued the requested warrants.[8]  (See id. ¶ 50.)

A week later, on March 20, 2014, while Martinovsky was driving his child to school, "numerous" officers, including Williams and Cubangbang, pulled him over, after which Williams and Cubangbang ordered him out of his car, gave him Miranda warnings, and asked if he wanted to make a statement.  (See id. ¶ 51.)  Additionally, during the course of the encounter, Williams accused Martinovsky of, inter alia, "running a . . . criminal organization (see id. ¶ 52), after which Martinovsky "was handcuffed, put into a law enforcement vehicle and taken to Alameda County Jail, where he was booked on the drug and insurance-fraud charges" and, "after 10 hours in custody," released on bail (id. ¶53).

Following Martinovsky's arrest, "[d]efendants" searched plaintiffs' clinic, sending patients away, interrogating employees, and "defam[ing]" Martinovsky to his employees, with Williams announcing, inter alia, "[t]his is a criminal enterprise and everyone who works here is a co-conspirator."  (See id. ¶ 54.)  Further, "[a]s a result of the arrest," the California Medical Board, "with the support of the County DA," moved, in connection with Martinovsky's request for bail, to suspend his medical license, which motion was denied by the Superior Court.  (See id. ¶ 56.)

Subsequently, the Alameda case was dismissed "on venue grounds" (see id. ¶ 57), and, based on the same events, a case in which Martinovsky was charged with one felony count under § 550(a)(7) was brought against him in Contra Costa County (the

---

[7] The document attached to and referenced in the FAC as Exhibit B bears the title "Statement of Probable Cause" (see id. at 1) and is cited by plaintiffs as the "Probable Cause Declaration" (see FAC ¶ 43).

[8] No party has provided the Court with a copy of any warrant.

United States District Court
Northern District of California

1  "Contra Costa case").  On September 29, 2015, at a preliminary hearing in the Contra

2  Costa case, the prosecution requested the charge be reduced to a misdemeanor, and the

3  parties agreed to a "pre-plea misdemeanor diversion order."  (See id.; see also Pls.' Req.

4  for Jud. Not., filed Apr. 22, 2016, Ex. A at 207:17–19, 207:25–208:2.)[9]  On August 31,

5  2016, Martinovsky having successfully completed the conditions of diversion, the Contra

6  Costa case was dismissed.

7  **C.   Plaintiffs' Claims**

8          Based on the above allegations, plaintiffs assert three Claims for Relief:[10] (1) a

9  federal claim under 42 U.S.C. § 1983 for "Deprivation of Civil Rights," in connection with

10  the search of their clinic ("First Claim") (see FAC ¶¶ 63–66); (2) a federal claim under 42

11  U.S.C. § 1983 for "Deprivation of Civil Rights," in connection with Martinovsky's arrest

12  and prosecution and the search of plaintiffs' clinic ("Second Claim") (see id. ¶¶ 67–71);

13  and (3) a federal claim under 42 U.S.C. § 1983 for "Deprivation of Civil Rights," based on

14  "Entity and Supervisory Liability" ("Third Claim") (see id. ¶¶ 72–78).

15          By the instant motions, County defendants and Cubangbang seek an order

16  dismissing all claims against them.

17                                    **LEGAL STANDARD**

18          Dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure "can be

19  based on the lack of a cognizable legal theory or the absence of sufficient facts alleged

20  under a cognizable legal theory."  See Balistreri v. Pacifica Police Dep't, 901 F.2d 696,

21  699 (9th Cir. 1990).  Rule 8(a)(2), however, "requires only 'a short and plain statement of

22  the claim showing that the pleader is entitled to relief.'"  See Bell Atlantic Corp. v.

23  Twombly, 550 U.S. 544, 555 (2007) (quoting Fed. R. Civ. P. 8(a)(2)).  Consequently, "a

24  _____

25          [9] By prior order, the Court granted plaintiffs' Request for Judicial Notice of said
        exhibit.  (See May 20 Order at 1 n.1.)

26          [10] Although the FAC alleges defendants "conspired" among themselves to violate
27  plaintiffs' constitutional rights (see FAC ¶¶ 12, 66), plaintiffs, in their opposition, make
        clear that they are "not alleg[ing] conspiracy liability" (see Pls.' Opp'n to County MTD at
28  21: 13–14).

United States District Court
Northern District of California

1    complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual

2    allegations." See id. Nonetheless, "a plaintiff's obligation to provide the grounds of his

3    entitlement to relief requires more than labels and conclusions, and a formulaic recitation

4    of the elements of a cause of action will not do." See id. (internal quotation, citation, and

5    alteration omitted).

6          In analyzing a motion to dismiss, a district court must accept as true all material

7    factual allegations in the complaint, and construe them in the light most favorable to the

8    nonmoving party. See NL Indus., Inc. v. Kaplan, 792 F.2d 896, 898 (9th Cir. 1986).[11] "To

9    survive a motion to dismiss, a complaint must contain sufficient factual material, accepted

10   as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S.

11   662, 678 (2009) (quoting Twombly, 550 U.S. at 570). "Factual allegations must be

12   enough to raise a right to relief above the speculative level[.]" Twombly, 550 U.S. at 555.

13   Courts "are not bound to accept as true a legal conclusion couched as a factual

14   allegation." See Iqbal, 556 U.S. at 678 (internal quotation and citation omitted).

## DISCUSSION

16         As discussed below, County defendants and Cubangbang challenge all of the

17   claims against them as inadequately pleaded.

18         The Court begins by addressing defendants' challenges to the inclusion of

19   Bermudez and Cubangbang in the above-referenced claims.

---

22         [11] Generally, a district court, in ruling on a Rule 12(b)(6) motion, may not consider
     any material beyond the complaint. See Hal Roach Studios, Inc. v. Richard Feiner & Co.,
     Inc., 896 F.2d 1542, 1555 n.19 (9th Cir. 1990). A district court may, however, consider
     documents that are subject to judicial notice. See Mack v. South Bay Beer Distribs., Inc.,
     798 F.2d 1279, 1282 (9th Cir. 1986). Here, County defendants' unopposed request for
     judicial notice, filed July 25, 2016, is hereby GRANTED as to both documents attached
     thereto, specifically: (1) a portion of the transcript of Martinovsky's preliminary hearing in
     the Contra Costa case (see Ex. A); and (2) a copy of an order striking claims alleged
     against Cubangbang and Williams in a case brought in Alameda County by a practitioner
     not involved in the events here at issue (see Ex. B). Similarly, plaintiffs' unopposed
     request, filed September 6, 2016, for judicial notice of the order dismissing the Contra
     Costa case (see Ex. C) is hereby GRANTED.

United States District Court
Northern District of California

**A.      Defendants Bermudez and Cubangbang**

As noted, each of plaintiffs' claims is brought under 42 U.S.C. § 1983.  To state a claim under § 1983, a plaintiff must allege two essential elements: (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a person acting under color of state law.  See West v. Atkins, 487 U.S. 42, 48 (1988).

Defendants contend plaintiffs have failed to allege any facts showing either Bermudez or Cubangbang participated in any alleged violation of plaintiffs' constitutional rights.

"An officer's liability under section 1983 is predicated on his integral participation in the alleged violation."  Blankenhorn v. City of Orange, 485 F.3d 463, 481 n.12 (9th Cir. 2007) (internal quotation and citation omitted).  Although "officers can be held liable for failing to intercede" when "their fellow officers violate the constitutional rights of a suspect," Cunningham v. Gates, 229 F.3d 1271, 1289 (9th Cir. 2000) (internal quotation and citation omitted), a failure to intercede is actionable "only if [the officer] had an opportunity" to do so, see id.

**1.      Bermudez**

With respect to Bermudez's alleged participation in any asserted wrongdoing, the FAC contains no more than general, conclusory allegations.  (See, e.g., FAC ¶ 43 (alleging Bermudez "collaborat[ed]" in preparation of PC Declaration); id. ¶ 44 (alleging Bermudez was "integral participant[]" in preparation of Walk Warrant and PC Declaration); id. (alleging Bermudez "had the opportunity to intervene in and prevent" violations of plaintiffs' rights); see also id. ¶¶ 11–12, 63, 66–68, 71.)  Such conclusory allegations are not sufficient to support plaintiffs' claims.  See Iqbal, 556 U.S. at 678. Plaintiffs' allegation that Bermudez, along with all of the defendants other than the County or O'Malley, "deliberately and recklessly included falsehoods and omitted material facts" in the PC declaration (see id. ¶ 45), fares no better, as plaintiffs have not alleged any facts suggesting Bermudez was even aware of the PC Declaration, let alone its content,

1  or that he in any manner was aware of, let alone present at, any of the events that

2  ensued.  See, e.g., Cunningham, 229 F.3d at 1290 (finding officers who were not present

3  at time of alleged misconduct "could not intercede" to prevent it).

4      Accordingly, to the extent plaintiffs bring their claims against Bermudez, such

5  claims are subject to dismissal.

6      **2.      Cubangbang**

7      As to Cubangbang, with the one exception discussed below, the FAC's allegations

8  of wrongdoing are identical to those made against Bermudez (see id. ¶¶ 11–12, 43–45,

9  63, 66–68) and, consequently, do not suffice to support a claim.  See Blankenhorn, 485

10  F.3d at 481 n.12.

11      The one exception pertains to Martinovsky's arrest.  In particular, the FAC alleges

12  Cubangbang was one of the officers who pulled Martinovsky over and, along with

13  Williams, "ordered [him] out of the car, gave Miranda admonitions[,] and asked whether

14  he wanted to 'give a statement.'"  (See FAC ¶ 51.)  The FAC also alleges Williams and

15  Cubangbang, as part of the investigation leading to such arrest, jointly monitored the wire

16  Bermudez wore at both the first and second visits, during which, the FAC alleges,

17  Martinovsky at all times acted in accordance with generally accepted, lawful medical

18  practice.  (See, e.g., id. ¶¶ 46, 47(g), & (47)(h).)

19      "The standard for arrest," whether with or without a warrant, "is probable cause,

20  defined in terms of facts and circumstances sufficient to warrant a prudent man in

21  believing that the [suspect] had committed or was committing an offense."  See Gerstein

22  v. Pugh, 420 U.S. 103, 111 (1975) (internal quotation and citation omitted) (alteration in

23  original).  Based on the above-referenced allegations, a reasonable inference can be

24  drawn that Cubangbang lacked probable cause upon which to make the arrest and had

25  no reason to assume otherwise.

26      Accordingly, to the extent plaintiffs bring their claims against Cubangbang, such

27  claims, with the exception of Martinovsky's claim for false arrest, are subject to dismissal.

28

United States District Court
Northern District of California

### 3.   Leave to amend

Ordinarily, the Court would afford plaintiffs an opportunity to plead, if they could do so, additional facts to support Bermudez and Cubangbang's involvement in the alleged misconduct.  In this instance, however, plaintiffs at the hearing on defendants' prior motions to dismiss were expressly advised of the need to plead such facts (see, e.g., Tr. of Proceedings for May 20, 2016 ("May 20 Tr."), at 15:4–23, 17:5–8, 34:6–7, 34:12–14; 46:7–12), and, with the above-referenced limited exception, have failed to do so.  Indeed, plaintiffs have in essence conceded their inability to provide additional factual support for their claims against Bermudez and Cubangbang.  (See Pls.' Opp'n to State MTD at 2 (stating plaintiffs are "hamstrung" by fact Cubangbang, to plaintiffs' knowledge, authored no report or other document and did not testify in any of the state-court proceedings; urging denial of motion to dismiss "regardless, so that this action can proceed to discovery"); see also, e.g., May 20 Tr. at 16:15–18 (explaining plaintiffs "don't know, because we haven't been able to do the discovery yet . . . what their [Bermudez, Cubangbang, and Williams's] roles were, and whether they all sat in [a] room and looked at it [the PC Declaration]")); see also Iqbal, 556 U.S. at 678–79 (noting Rule 8 "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions").

Accordingly, as it appears plaintiffs have pleaded all the facts they have available, the Court finds further leave to amend would be futile.  See Janicki Logging Co. v. Mateer, 42 F.3d 561, 566 (9th Cir. 2004) (holding leave to amend need not be granted where amendment of complaint would "constitute[] an exercise in futility") (internal quotation and citation omitted); Dougherty v. City of Covina, 654 F.3d 892, 901 (9th Cir. 2011) (holding leave to amend would be futile where plaintiff failed to allege facts sufficient to state a claim and did not identify any such facts in his briefing or argument).

### 4.   Conclusion

As to defendants Bermudez and Cubangbang, for the reasons stated above, plaintiffs' First Claim and Second Claim, with the exception of Martinovsky's claim against Cubangbang for false arrest, are hereby DISMISSED without further leave to amend.

The Court next addresses the challenges brought on behalf of the remaining defendants.

## B.     First Claim

In their First Claim, plaintiffs allege Williams[12] violated their Fourth Amendment rights in connection with the search of their clinic.[13]  In particular, plaintiffs allege, Williams: (1) "[s]ubmitt[ed] an application for a search warrant" for plaintiffs' clinic "without exercising reasonable judgment that probable cause existed" (see FAC ¶ 63(a)); (2) "[d]eliberately and recklessly includ[ed] falsehoods and omitt[ed] material facts" in the Walk Warrant and PC Declaration that "compromised the judgment of the issuing magistrate" (see id. ¶ 63(b)); and (3) searched plaintiffs' clinic "without a valid warrant or probable cause and in an unreasonable manner" (see id. ¶ 63(c)).

Plaintiffs do not challenge the facial sufficiency of the warrant.  (See, e.g., May 20 Tr. at 27:14–15.)  Accordingly, the Court reads the First Claim as challenging the above-referenced search on two bases: (1) that Williams obtained the warrant through judicial deception; and (2) that the search was conducted in an unreasonable manner.

### 1.     Judicial deception in procuring warrants

Plaintiffs allege the PC Declaration contains material falsehoods and omissions relating to both illegal dispensing and insurance fraud.  (See FAC ¶¶ 45–47.)  In support of their motions to dismiss, defendants contend the PC Declaration contains sufficient "undisputed" observations to support probable cause to issue the warrant, even after correcting and supplementing the declaration to account for the alleged falsehoods and omissions.  (See County MTD at 8; State MTD at 4.)

---

[12] The First Claim is brought only against Bermudez, Cubangbang, and Williams.

[13] Although the First Claim includes allegations that could be construed as pleading a Fourteenth Amendment violation, namely, that Williams's "acts and omissions" in connection with the search "constitute a gross abuse of governmental authority and power, shock the conscience, [and] are fundamentally unfair" (see FAC ¶ 64), plaintiffs in their opposition clarify that their First Claim is based solely on the Fourth Amendment (see Pls.' Opp'n to County MTD at 12).

1    "A search warrant, to be valid, must be supported by an affidavit establishing

2   probable cause."  See United States v. Stanert, 762 F.2d 775, 778 (9th Cir. 1985)

3   (holding court, in determining validity of warrant, "is limited to the information and

4   circumstances contained within the four corners of the . . . affidavit").  In assessing

5   whether probable cause exists, "[t]he task of the issuing magistrate is simply to make a

6   practical, common-sense decision whether, given all the circumstances set forth in the

7   affidavit before him, . . . there is a fair probability that contraband or evidence of a crime

8   will be found in a particular place."  Illinois v. Gates, 462 U.S. 213, 238 (1983).  "[T]he

9   duty of a reviewing court is simply to ensure that the magistrate had a substantial basis

10   for . . . conclud[ing] that probable cause existed."  Id. at 238–39 (alteration in original)

11   (internal quotation and citation omitted).

12         A facial showing of probable cause may, however, be challenged.  In particular,

13   government investigators can be held "liable for violating the Fourth Amendment when

14   they submit false and material information in a warrant affidavit."  See Galbraith v. County

15   of Santa Clara, 307 F.3d 1119, 1126 (9th Cir. 2002).  A claim alleging judicial deception

16   with respect to such an affidavit requires the plaintiff to show: (1) the affidavit "contained

17   misrepresentations or omissions material to the finding of probable cause"; and (2) "the

18   misrepresentations or omissions were made intentionally or with reckless disregard for

19   the truth."  See Bravo v. City of Santa Maria, 665 F.3d 1076, 1083 (9th Cir. 2011).  To

20   assess the materiality of a false statement or misleading omission, the district court must

21   determine "whether the affidavit, once corrected and supplemented, would provide a

22   magistrate with a substantial basis for concluding that probable cause existed."  See

23   Stanert, 762 F.2d at 782.  "If probable cause remains after amendment, then no

24   constitutional error has occurred."  Bravo, 665 F.3d at 1084.

25              **a.     Unlawful dispensing**

26         As noted above, the Walk Warrant charged Martinovsky with a violation of § 4170,

27   in connection with the first visit, for "unlawfully dispens[ing] drugs to patients in his office."

28   (See Walk Warr. at 1.)  Pursuant to § 4170, "[n]o prescriber shall dispense drugs or

United States District Court
Northern District of California

United States District Court
Northern District of California

dangerous devices to patients in his or her office or place of practice unless" in

accordance with a number of specified conditions.  See Cal. Bus. & Prof. Code

§ 4170(a).  As relevant here,[14] those conditions are: (1) "[t]he dangerous drugs . . . are

dispensed to the prescriber's own patient, and . . . are not furnished by a nurse or

physician attendant," see id. § 4170(a)(1), as contrasted with a PA "who functions

pursuant to Section 3502.1,"[15] who "may hand to a patient of the supervising physician

. . . a properly labeled prescription drug prepackaged" by a physician, manufacturer, or

pharmacist, see id. § 4170(a)(8); (2) such drugs are "necessary in the treatment of the

condition for which the prescriber is attending the patient," see id. § 4170(a)(2); (3) the

prescriber fulfills specified labeling, recordkeeping, and packaging requirements, see id.

§ 4170(a)(4); (4) the prescriber, "prior to dispensing, offers to give a written prescription

to the patient that the patient may elect to have filled by the prescriber or by any

pharmacy," see id. § 4170(a)(6); and (5) the prescriber "provides the patient with written

disclosure that the patient has a choice between obtaining the prescription from the

dispensing prescriber or obtaining the prescription at a pharmacy of the patient's choice,"

see id. § 4170(a)(7).

Here, the FAC alleges plaintiffs, in dispensing prescription medications to

Bermudez on the first visit, "followed all" of the above-referenced requirements (see FAC

¶¶ 35, 46) and includes facts supporting that allegation.  In particular, the FAC alleges

that all of the prescription drugs were prescribed to Martinovsky's own patient, Bermudez,

and were furnished to him by a licensed PA as authorized by § 4170(a)(8); that such

medications were "appropriate" (see id. ¶ 46(d)), given the level of pain and the MRI

---

[14] Subsections (a)(3) and (a)(5), which, respectively, bar prescribers from keeping a pharmacy or similar establishment for retailing dangerous drugs, see id. § 4170(a)(3), and limit their use of dispensing devices, see id. § 4170(a)(5), do not appear relevant here.

[15] Pursuant to § 3502.1 of the California Business & Professions Code, a PA who is supervised by a licensed physician may, inter alia, "administer or provide medication to a patient."  See id. § 3502.1(a).

1  results Bermudez reported; that the medications were "properly packaged and labeled"

2  (see id. ¶ 46(b));[16] and that Bermudez was "given notice that he could elect to have the

3  prescription filled by a pharmacy" (see id.).[17]

4  　　　Defendants argue that, notwithstanding "possible technical" compliance with

5  § 4170 (see State MTD at 5), probable cause nonetheless existed based on how the

6  situation appeared to the investigating officers.  In support thereof, defendants, citing

7  undisputed portions of the PC Declaration, note that neither Martinovsky nor any of his

8  staff discussed with Bermudez usage of the prescribed pain medications; neither of the

9  individuals who handed Bermudez the medications "appeared to be a pharmacist or

10  [r]egistered [n]urse" (see id.); the examination was relatively brief, just "nine-and-a-half

11  minutes long" (see id.), during which Martinovsky also took an unrelated phone call; and

12  the clinic generally appeared to be "disorganized" (see id. at 8–9 & n.7).  None of the

13  above circumstances, however, constitutes a violation of any provision of § 4170.

14  Consequently, such circumstances, whether viewed individually or collectively, while

15  perhaps suggesting something other than the highest-quality practice, do not suffice to

16  support a finding of probable cause to search the clinic.

17  　　　　　**b.　Insurance fraud**

18  　　　As noted above, the Walk Warrant charged Martinovsky with violating § 550(a)(7)

19  in connection with all three visits and with violating § 550(b)(1) in connection with the

20  second and third visits.  (See Walk Warr. at 1–2.)  Pursuant to § 550(a)(7), it is unlawful

21  to "[k]nowingly submit a claim for a health care benefit that was not used by, or on behalf

22  of, the claimant" or to "aid, abet, solicit, or conspire with any person" to do so.  See Cal.

23  Penal Code § 550(a)(7).  Pursuant to § 550(b)(1), it is unlawful to "[p]resent or cause to

24

25  　　　[16] Defendants do not raise the recordkeeping requirement of subsection (a)(4) as a
26  basis for challenging plaintiffs' compliance with § 4170.

27  　　　[17] Although arguably conclusory in nature, no defendant challenges the sufficiency
of such allegation, and plaintiffs, in their opposition, state "IPC had a sign" that provided
28  the requisite written disclosure.  (See Pls.' Opp'n to County MTD at 4.)

United States District Court
Northern District of California

1    be presented any written or oral statement as part of, or in support of or opposition to, a

2    claim for payment or other benefit pursuant to an insurance policy, knowing that the

3    statement contains any false or misleading information concerning any material fact" or to

4    "knowingly assist or conspire with any person" to do so.  See id. § 550(b)(1).

5         "The elements generally necessary to find a violation of Penal Code section 550

6    are (1) the defendant's knowing presentation of a false claim, (2) with the intent to

7    defraud."  People ex rel. Govt. Emps. Ins. Co. v. Cruz, 244 Cal. App. 4th 1184, 1193

8    (2016).  Liability under the Insurance Fraud Prevention Act, which includes § 550, see id.

9    at 1187, "does not require that a fraudulent claimant's scheme be successful . . .; [the

10   claimant] need only knowingly present a false claim with the intent to defraud," id. at

11   1199.  Intent to defraud "may be determined by consideration of all the circumstances in

12   evidence."  People v. Singh, 37 Cal. App. 4th 1343, 1371 (1995).

**(1)     First visit**

14        With respect to the first visit, defendants contend a number of facts establish

15   probable cause for a search based on insurance fraud.  In that regard, defendants first

16   note Martinovsky's use of CPT code 99245 to bill the examination as a "high complexity

17   evaluation" despite its short duration (see County MTD at 9–10; State MTD at 5–6),[18] as

18   well as Martinovsky's description of the physical examination, including the tests he

19   reportedly performed, which description, according to defendants, was "fabricated" (see

20   PC Decl. at 24).  Appropriate use of CPT code 99245 is not dependent, however, on an

21   examination of any particular duration, and, as alleged in the FAC, Martinovsky did not

22   indicate he was "billing [such code] based on time he spent face to face" with Bermudez

23   (see FAC ¶ 47(g)), but, rather, on the complexity of the examination, which, as alleged in

24   the FAC, "took place as described in the documentation submitted" (see id. ¶ 47(h); see

25   also id. ¶ 47(g)).

26   _____

27        [18] Cubangbang's contention that CPT code 99245 "requires a comprehensive review of medical records" (see State MTD at 6) is not supported by the record (see PC Decl. at 21 (stating CPT code 99245 requires "[a] comprehensive history, a comprehensive examination, and medical decision making of high complexity")).

28

United States District Court
Northern District of California

1    While County defendants also point to the amount of the billing, $2283 for the first

2    visit, including $400 for Martinovsky's services and $1645 for the medications, an amount

3    considerably higher than a price Williams obtained from Walgreens, nothing in the PC

4    Declaration indicates a $400 billing would be unusual for a high complexity evaluation,

5    and, as to the cost of the medications, plaintiffs allege the apparent differential is

6    attributable to "different formulations, with different NDC [National Drug Code] numbers,

7    than the ones Williams is quoting" (see FAC ¶ 47(l)).

8    The additional factors on which defendants rely, namely, Martinovsky's questions

9    about Bermudez's legal representation and his prescription of multiple drugs without

10   discussing their usage or reviewing Bermudez's shoulder MRI, likewise are unavailing.

11   Defendants point to nothing medically improper, let alone unlawful, in any such conduct.

12   Indeed, as to the MRI, there is no allegation that Martinovsky on the first visit had access

13   to such result, and, as alleged in the FAC, the shoulder MRI was not available at that

14   time, only a knee MRI and a chiropractic report, both of which he did review.

15                      **(2)    Second and third visits**

16   With respect to the second and third visits, defendants again contend a number of

17   facts establish probable cause for a search based on insurance fraud.

18   In this instance, however, the Court agrees.  In the context of a search warrant,

19   the relevant inquiry is whether "there is a fair probability that contraband or evidence of a

20   crime will be found in a particular place."  See Gates, 462 U.S. at 238; see also Ewing v.

21   City of Stockton, 588 F.3d 1218, 1228 (9th Cir. 2009) (finding question of whether male

22   plaintiff was involved in alleged crime "irrelevant"; holding "[t]he question was whether

23   there was probable cause to search [couple's] house, not to arrest [male plaintiff]").

24   Here, the PC Declaration states Curtis saw Bermudez on the second and third

25   visits and that he falsely reported in each of two claims submitted to Farmers that he

26   conducted motor strength testing, a sensory exam, and a deep tendon reflex exam and,

27   in an apparent reuse of a report submitted for another patient, described Bermudez as

28   "[a] well nourished female."  (See PC Decl. at 27.)  Further, the PC Declaration states

United States District Court
Northern District of California

that Curtis offered Bermudez medication during the third visit even though Bermudez said he was no longer in pain, and told Bermudez he could return for additional visits if his attorney so desired.  The FAC contains no allegations to the contrary; rather, it alleges that the PC Declaration, in setting forth the above misrepresentations and events, "states nothing about any action or conduct by [] Martinovsky."  (See FAC ¶ 48; see also Pls.' Opp'n to County MTD at 3 (asserting neither of the visits "with PA Curtis . . . involved [] Martinovsky directly").)

In sum, as facts sufficient to support probable cause remain after the PC Declaration is corrected to both remove all disputed material facts and add all omitted material facts, plaintiffs have failed to state a claim for judicial deception with respect to the search.[19]  See, e.g., Ewing, 588 F.3d at 1224–26 (holding plaintiffs' claim for judicial deception failed where evidence independent of deceptive representations provided "substantial basis" for finding probable cause to search plaintiffs' home for evidence of crime).

Accordingly, to the extent the First Claim is based on judicial deception, it is subject to dismissal.

### 2.    Manner of search

As noted above, plaintiffs also challenge the manner in which Williams conducted the search of the clinic, which claim is predicated solely on the alleged defamatory statements Williams made to staff at the clinic.  (See FAC ¶ 54; see also Pls.' Opp'n to County MTD at 12.)

Under the Fourth Amendment, a search "may be invalid if carried out in an unreasonable fashion."  See Franklin v. Foxworth, 31 F.3d 873, 875, 876–77 (9th Cir. 1994) (emphasis in original) (holding officers acted unreasonably in removing gravely ill, semi-naked man from sickbed without providing clothing, and then forcing him to remain

_____

[19] In light of such finding, the Court does not address herein County defendants' argument that Williams is entitled to qualified immunity with respect to plaintiffs' judicial deception claim.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    handcuffed and sitting upright even after completing search of his room).  Although there

2    is some question as to whether such a claim can be based solely on allegedly

3    defamatory statements, see, e.g., Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179,

4    1994 (10th Cir. 2001) (noting "[w]hile it seems unlikely that harsh language alone would

5    render a search or seizure 'unreasonable,' verbal abuse may be sufficient to tip the

6    scales in a close case"), here defendants have not challenged the claim to the extent it is

7    based on the alleged unreasonable manner of the search.

8    　　　Accordingly, to the extent the First Claim is so based, the Court does not address

9    it further at this time.

10   　　　**3.　　Conclusion**

11   　　　For the reasons set forth above, to the extent the First Claim is based on judicial

12   deception in procuring the search warrant, said claim is hereby DISMISSED, and to the

13   extent it is based on the manner of the search, said claim will remain.

14   **C.　　Second Claim**

15   　　　In their Second Claim, plaintiffs allege Williams and Cubangbang[20] violated

16   Martinovsky's Fourth and Fourteenth Amendment rights.[21]

17   　　　**1.　　False Arrest**

18   　　　Plaintiffs allege Williams and Cubangbang falsely arrested Martinovsky.  In

19   support thereof, they allege said defendants "submitt[ed] an application" for a warrant to

20   arrest Martinovsky "without exercising reasonable judgment that probable cause existed"

21   for such arrest (see FAC ¶ 67(a)), "[d]eliberately and recklessly includ[ed] falsehoods and

22   omitt[ed] material facts" in the PC Declaration that "compromised the judgment of the

23   issuing magistrate" (see id. ¶ 67(b)), and "arrest[ed] [] Martinovsky without a valid warrant

24   _____

25   　　　[20] In light of the Court's ruling dismissing all claims against Cubangbang other than
     false arrest, see supra Part A.4., the Court, as to said defendant, addresses the

26   sufficiency of the Second Claim only to the extent such claim is based on false arrest.

27   　　　[21] In their opposition, plaintiffs clarify that, except to the extent the Second Claim is
     based on malicious prosecution, such cause of action alleges only "Fourth-Amendment

28   deprivations."  (See Pls.' Opp'n to County MTD at 13; see also id. at 14–15.)

1    or probable cause" (see id. ¶ 67(d)).[22]

2         "The Fourth Amendment requires that arrest warrants be based 'upon probable

3    cause, supported by [o]ath or affirmation.'" Kalina v. Fletcher, 522 U.S. 118, 129 (1997)

4    (quoting Fourth Amendment).  Probable cause "need only exist as to any offense that

5    could be charged under the circumstances."  See Blankenhorn, 485 F.3d at 473 (internal

6    quotation and citation omitted).

7         As with a claim for unlawful search, a plaintiff "may bring a § 1983 claim for an

8    arrest pursuant to an improperly issued arrest warrant," see Smith v. Almada, 640 F.3d

9    931, 937 (9th Cir. 2011), and may do so on the basis of judicial deception, see id.

10   (holding plaintiff must show officer who applied for arrest warrant "deliberately or

11   recklessly made false statements or omissions that were material to the finding of

12   probable cause") (internal quotation and citation omitted).

### a.    Unlawful dispensing

14        The analysis set forth above, see supra Part B.1.a., applies equally to the question

15   of whether there was probable cause to arrest Martinovsky for unlawful dispensing in

16   violation of § 4170, and, accordingly, the Court finds the PC Declaration does not include

17   facts sufficient to support probable cause to arrest Martinovsky for such violation.

### b.    Insurance fraud

19        With respect to the first visit, the analysis set forth above, see supra Part B.1.b.(1),

20   applies equally to the question of whether there was probable cause to arrest

21   Martinovsky for insurance fraud in violation of § 550, and, accordingly, the Court finds the

22   PC Declaration does not include facts sufficient to support probable cause to arrest

23   Martinovsky for such violation.

24        With respect to the second and third visits, the Court likewise finds the PC

_____

26        [22] As discussed above, see supra Part A.2., although the FAC contains no
27   allegations from which one may infer Cubangbang was aware of the content of the PC
     Declaration let alone participated in its submission to the magistrate, plaintiffs' false arrest
     claim against said defendant survives dismissal based on a lack of facts sufficient to
28   support probable cause for Martinovsky's arrest.

United States District Court
Northern District of California

1    Declaration does not include facts sufficient to support probable cause to arrest

2    Martinovsky for such violation.  In particular, §§ 550(a)(7) and (b)(1), as discussed above,

3    both require that the arrestee have acted knowingly and with an intent to defraud.  Here,

4    the PC Declaration does not contain facts sufficient to support a finding that Martinovsky

5    was present at either examination or otherwise aware of Curtis's misrepresentations to

6    Farmers.  Although the PC Declaration identifies Curtis as "Martinovsky's PA" (see PC

7    Decl. at 25) and states the bill submitted to Farmers for the second visit was "for services

8    rendered by Gary Martinovsky MD" (see id. at 26), defendants have not pointed to any

9    authority indicating Martinovsky's ownership of the clinic or general responsibility for

10   supervision of Curtis as a PA suffice to subject him to criminal prosecution as opposed to

11   potential civil liability.

12           Accordingly, as to Williams, plaintiffs have stated a claim for false arrest based on

13   judicial deception[23] and, as set forth above in Part A.2., as to Cubangbang, a claim for

14   false arrest based on a lack of probable cause.

15           **2.      Unlawful Search**

16           As with the First Claim, plaintiffs allege Williams violated Martinovsky's Fourth

17   Amendment rights based on the search of their clinic, and, as County defendants point

18   out, those allegations are identical to the allegations set forth in support of plaintiffs' First

19   Claim.  (Compare FAC ¶¶ 67(a), (b), & (e) with id. ¶¶ 63(a)–(c)); see, e.g. Ayala v. City of

20   Hayward, 2010 WL 3619566, *3–4 (N.D. Cal. 2010) (dismissing with prejudice claims that

21   duplicated other claims).

22           Accordingly, subparts (a), (b), and (e) of the Second Claim are subject to dismissal

23   to the extent those subparts are based on the above-referenced search.

24

25

26           [23] In light of such finding, County defendants' reliance on qualified immunity is
      unavailing.  See, e.g., Chism v. Washington State, 661 F.3d 380, 393 (9th Cir. 2011)
27   (holding "qualified immunity is not appropriate once a plaintiff has made out a judicial
      deception claim").
28

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

### 3.    Malicious Prosecution

Plaintiffs allege Williams violated Martinovsky's Fourth (see FAC ¶ 67) and

Fourteenth (see id. ¶ 68) Amendment rights by "[c]ausing [] Martinovsky to be maliciously

prosecuted" in Alameda County "and to have to undergo a license suspension hearing" in

the course of those proceedings (see id. ¶¶ 67(g), 68(b)),[24] by "[p]reparing false reports

and lying to the prosecuting attorneys to cause the filing of false and malicious criminal

charges, including specious drug offenses" (see id. ¶¶ 67(c), 68(a)).[25]

To bring a claim of malicious prosecution under § 1983, a plaintiff "must allege that

the defendants prosecuted [him] with malice and without probable cause, and that they

did so for the purpose of denying [him] . . . [a] specific constitutional right." Lacey v.

Maricopa County, 693 F.3d 896, 919 (9th Cir. 2012) (en banc) (internal quotation and

citation omitted).  In addition, a plaintiff must allege "termination of the prior criminal

proceeding in favor of the accused," see id. at 919 n.12 (internal quotation and citation

omitted), which generally requires a showing "that the prior proceedings terminated in

such a manner as to indicate his innocence," see Awabdy v. City of Adelanto, 368 F.3d

1062, 1068 (9th Cir. 2004).

Here, plaintiffs allege the Alameda case was dismissed "on venue grounds."  (See

FAC ¶ 57.)  A termination on such procedural ground does not suffice to meet the

requisite element of favorable termination, as it does not in any manner indicate

Martinovsky's innocence of the charges brought against him.  See Nunez v. Pennisi, 241

Cal. App. 4th 861, 874 (2015) (holding "[a] technical or procedural termination[,] such as

a dismissal on statute of limitations grounds, . . . is not favorable for purposes of a

malicious prosecution claim"); Awabdy, 368 F.3d at 1066–68 (applying California law in

analyzing malicious prosecution claim under § 1983).

---

[24] There is no allegation that the license suspension hearing was conducted in a manner violative of the Fourteenth Amendment.

[25] In their opposition, plaintiffs clarify that ¶¶ 67(c) and 67(g) both pertain to Martinovsky's claim of malicious prosecution.  (See Pls.' Opp'n to County MTD at 14.)

21

1   Accordingly, to the extent the Second Claim is based on malicious prosecution,

2   such claim is subject to dismissal.

3       **4.    Defamation-Plus**

4       Plaintiffs allege Williams defamed Martinovsky both after his arrest and during the

5   search of the clinic. (See FAC ¶ 67(f).) In particular, as discussed above, they allege

6   that Williams, after pulling Martinovsky over to arrest him, and, subsequently, during the

7   search of the clinic, accused Martinovsky of involvement in criminal activity. (See id.

8   ¶¶ 52, 54.) County defendants contend plaintiffs have failed to adequately plead a claim

9   for defamation-plus.

10       "As an initial matter," County defendants argue, without further elaboration,

11   plaintiffs "fail to plead any of the underlying requisite elements for a defamation claim."

12   (See County MTD at 13:14–15.) The Court is not persuaded. See Cal. Civ. Code

13   § 44(b) (stating "[d]efamation is effected by . . . [s]lander"); id. § 46(1) (defining slander as

14   a "false and unprivileged" oral publication that, inter alia, "[c]harges any person with

15   crime").

16       For defamation to be actionable under § 1983, however, the plaintiff must plead

17   what has been termed a "stigma-plus" or "defamation-plus" claim, which requires

18   alleging "loss of a recognizable property or liberty interest in conjunction with the

19   allegation of injury to reputation." See Cooper v. Dupnik, 924 F.3d 1520, 1532 & n.22

20   (9th Cir. 1991) (holding "[t]he 'plus' part of this test can be met by . . . the denial of a right

21   specifically secured by the Bill of Rights"), adopted in relevant part by Cooper v. Dupnik,

22   963 F.2d 1220, 1235 n.6 (9th Cir. 1992) (en banc) ("not disturb[ing] the panel's holding

23   with respect to the defamation claim"), overruled on other grounds by Chavez v.

24   Martinez, 538 U.S. 760 (2003).

25       One of the "two ways to state a cognizable § 1983 claim for defamation-plus" is to

26   "allege that the injury to reputation was inflicted in connection with a federally protected

27   right." Crowe v. County of San Diego, 608 F.3d 406, 444 (9th Cir. 2010) (internal

28   quotation and citation omitted); see, e.g. Gobel v. Maricopa County, 867 F.2d 1201, 1205

United States District Court
Northern District of California

(9th Cir. 1989) (holding plaintiffs stated defamation-plus claim "because they alleged that the false statements were made in connection with their illegal arrest"), abrogated on other grounds by Merritt v. County of Los Angeles, 875 F.2d 765, 769 (9th Cir. 1989);[26] see also Marrero v. City of Hialeah, 625 F.2d 499, 519 (5th Cir. 1980) (holding, for purposes of defamation-plus, "the defamatory communication need not cause the loss of the protected right . . .[;] [i]nstead, it is sufficient that the defamation occur in connection with, and be reasonably related to, the alteration of the right").

Here, as set forth above, plaintiffs have stated a claim based on a Fourth Amendment violation with respect to Martinovsky's arrest, and the alleged defamatory statements were made in the course of that arrest.  By contrast, as set forth above, plaintiffs have failed to show defendants lacked probable cause for the search warrant.

Accordingly, plaintiffs have stated a claim for defamation-plus predicated on Martinovsky's arrest, but not on the search of the clinic.

### 5.     Conclusion

As to Williams, for the reasons set forth above, to the extent the Second Claim is based on the alleged unlawfulness of the search, on malicious prosecution, and on defamation in connection with the search, such claim is hereby DISMISSED; to the extent the Second Claim is based on judicial deception in procuring the arrest warrant and on defamation in connection with the arrest, such claim is not subject to dismissal.  As to Cubangbang, for the reasons set forth above, to the extent the Second Claim is based on a lack of probable cause for the arrest, such claim is not subject to dismissal.

### D.     Third Claim

In their Third Claim, plaintiffs allege the County is liable for violations of plaintiffs' civil rights by reason of three alleged policies, customs, and/or practices (see FAC ¶¶ 72–

---

[26] County defendants' effort to distinguish Gobel, on the ground the defamatory statements therein were made to the media, is unavailing.  Although defamation-plus cases often are based on law-enforcement comments to the press or other media, nothing in Gobel suggests its holding was dependent on the composition of the alleged defamer's audience.  See id.

United States District Court
Northern District of California

76); plaintiffs allege O'Malley is liable "[a]s a supervisor" (see id. ¶ 77; see also Pls.'
Opp'n to County MTD at 17 (characterizing claim against O'Malley as a "supervisory
claim")).

The Court turns first to plaintiffs' claims against the County.

### 1.   The County

A local government may be sued under § 1983 where an allegedly unconstitutional
action "implements or executes" a government policy or custom.  See Monell v. Dept. of
Soc. Servs., 436 U.S. 658, 690–91 (1978).  Liability cannot be based, however, on a
respondeat superior theory.  See id. at 691.  Thus, to establish Monell liability, a plaintiff
must show: "(1) that [he] possessed a constitutional right of which [he] was deprived; (2)
that the municipality had a policy; (3) that this policy amounts to deliberate indifference to
the plaintiff's constitutional right; and[] (4) that the policy is the moving force behind the
constitutional violation."  See Dougherty, 654 F.3d at 900.  "Absent a formal
governmental policy, [a plaintiff] must show a longstanding practice or custom which
constitutes the standard operating procedure of the local government entity."  Trevino v.
Gates, 99 F.3d 911, 918 (9th Cir. 1996) (internal quotation and citation omitted).

County defendants contend plaintiffs have failed to allege sufficient facts to
support a Monell claim.  As discussed below, the Court agrees.

### a.   Funding from insurance companies

Plaintiffs allege the County's "professional judgment and supervision of criminal
investigations" has been "compromised by accepting financial grants based on money
contributed through Workers' Compensation insurance carriers to investigate, to arrest,
and to otherwise harass applicant attorneys and medical providers."  (See FAC ¶ 72.)  In
particular, plaintiffs allege, the County's purpose is not to enforce criminal statutes but,
rather, "to give phony ammunition to defense firms . . . to discredit medical providers"
who treat and advocate for applicants (see id.) and that, "to keep the grant money
flowing, [it] side[s] with the insurance industry against medical providers" (see id. ¶ 73).

In support thereof, plaintiffs allege that: (1) the California Fraud Assessment

United States District Court
Northern District of California

Commission ("CFAC")[27] collects money from insurance companies and gives grants to prosecutors' offices to investigate and prosecute insurance fraud; (2) CFAC gives the Alameda County DA's Office ("DA's Office") "over $3 million" annually for such purpose, which sum includes "over $1.5 million" for workers' compensation fraud (see id. ¶ 23); (3) "targeting medical providers leads to more funds" from CFAC for local entities "such as" the DA's Office (see id. ¶ 24); (4) the DA's Office "began the investigation that ultimately targeted [p]laintiffs because of its close ties" to the DOI, insurers, and Knox Ricksen (see id. ¶ 21), a law firm that represents insurers in workers' compensation litigation (see id. ¶ 19) and that "collud[ed] with [d]efendants" (see id. ¶ 20); (5) Knox Ricksen attorneys and clients "have expressed displeasure" with the manner in which Martinovsky has treated and referred patients (see id. ¶ 19); (6) Knox Ricksen "motivated [d]efendants to subject [] Martinovsky to a false arrest on drug and insurance-fraud charges" (see id. ¶ 20); and (7) "[g]iven the relationships" among Knox Ricksen, the DOI, and the DA's Office, "[d]efendants must have been informed that [plaintiffs] were adversaries of Knox Ricksen and its insurance clientele" and "thus found themselves in [a] position to use the [chiropractic clinic's] referral to target [p]laintiffs" (see id. ¶ 30).

Despite the number of such allegations, plaintiffs have failed to satisfy the second Monell element, namely, the existence of a municipal policy, as they have failed to allege facts sufficient to show any such policy exists. Rather, in conclusory allegations, they accuse the County, through O'Malley, of being biased in the prosecution of Martinovsky and others based on its receipt of state-authorized funding to combat crime. See Iqbal, 556 U.S. at 678. Given such circumstances, an inference of improper animus is not a plausible conclusion. See id. at 681–82. Indeed, pursuant to California law, see Cal. Penal Code § 11161.5, the state legislature has directed the California District Attorneys

---

[27] According to the California Department of Insurance, the California Fraud Assessment Commission, whose members are appointed by the Governor, is "charged with allocating funding to fraud prosecutors statewide." (See http://www.insurance.ca.gov/0300-fraud/0100-fraud-division-overview/20-fac/.)

1   Association ("CDAA") to develop protocols for interagency investigations related to the

2   prescription of medication to patients in pain cases, see id. § 11161.5(a), and has further

3   directed that "[t]he costs incurred by the [CDAA] in implementing [such] section . . . be

4   solicited and funded from nongovernmental entities," id. § 11161.5(b).  Lastly, to the

5   extent plaintiffs rely on the acquittal of the chiropractors who treated Bermudez (see FAC

6   ¶ 74) and the ultimate dismissal of charges against another chiropractor in an unrelated

7   case (see id.), such reliance is unavailing, as neither result gives rise to an inference of

8   improper conduct on the part of either the County or O'Malley.[28]

9   **b.     Targeting of certain providers**

10      Plaintiffs allege the DA's Office has a "pattern and practice of targeting doctors

11   and chiropractors in less affluent locations, particularly those providing care to the

12   Hispanic patient population."  (See id. ¶ 75.)  In support thereof, plaintiffs point to the

13   preliminary hearing in the Contra Costa case, at which Williams testified that

14   Martinovsky's treatment of a large number of Hispanic patients raised "warning signs"

15   and that he believed Martinovsky would "target" Bermudez to make a fraudulent claim.

16   (See id.; see also County Defs.' Req. for Jud. Not., Ex. A at 159:15–18, 159:27–160:1.)

17      Plaintiffs have failed to allege, however, facts sufficient to show the DA's Office, as

18   opposed to Williams as an individual, holds such beliefs, let alone adopted a policy based

19   thereon.  Moreover, even as to Williams, the FAC contains allegations inconsistent with

20   the above assertion that plaintiffs, because of the location of their practice and ethnicity of

21   their patients, were targeted for investigation.  (See FAC ¶ 30 (alleging plaintiffs were not

22   "initial[]" targets of investigation and only became a focus as known "adversaries" of Knox

23   Ricksen).

24   **c.     Use of unqualified, biased investigators**

25      Plaintiffs allege the County has "policies of allowing investigators like [] Williams,

26   _____

27      [28] Indeed, in the unrelated case, the court, after a preliminary hearing, ruled the
    majority of the counts against the chiropractor were supported by probable cause.  (See
28   County Defs.' Req. for Jud. Not., Ex. B at 2.)

1  who lacks expertise in medicine, workers compensation and insurance, and who harbor

2  ethnic biases against Hispanic people[,] to submit warrants and make arrests based on

3  technical issues involving professional standards of care that they are not qualified to

4  determine."  (See id. ¶ 76.)

5      Again, plaintiffs have failed to allege facts sufficient to show the County has

6  instituted or maintained the policies alleged.  Notably, the facts plaintiffs plead in support

7  of the above allegation do not include any reference to investigators "like [] Williams," but

8  only to a single investigator, namely, Williams himself, and then only in connection with

9  the investigation here at issue.  (See, e.g., id. ¶¶ 43, 46(f), 47(g), 47(l), 51); see Trevino,

10  99 F.3d at 918 (holding custom, to be actionable, "must be so persistent and widespread"

11  that it "has become a traditional method of carrying out policy") (internal quotation and

12  citation omitted).  Moreover, as to Williams, the relevant facts, read in context, do not

13  suggest a bias against an ethnic group but rather a concern that, in his experience,

14  Hispanic patients, although in some instances "co-conspirators," are often targeted as

15  "victims" by unscrupulous practitioners.  (See County Defs.' Req. for Jud. Not., Ex. A at

16  158:26–159:18).

17      Accordingly, plaintiffs' claims against the County are subject to dismissal.

18      **2.   O'Malley**

19      Plaintiffs allege O'Malley, "[a]s a supervisor, . . . set into motion, or failed to stop,

20  the series of acts that caused" plaintiffs' harm.  (See FAC ¶ 77.)  In particular, plaintiffs

21  allege, "O'Malley or her subordinates allowed a busy doctor to be arrested on multiple,

22  unprovable and wildly exaggerated felony charges" and allowed IPC "to be raided,

23  abruptly disrupting the operations of a busy medical clinic."  (See id.)  County defendants

24  contend plaintiffs have failed to allege facts sufficient to support a supervisory liability

25  claim.[29]

26

27      [29] County defendants' additional argument that O'Malley has absolute immunity is
unavailing, as plaintiffs bring their claims against O'Malley not in her prosecutorial
capacity but, rather, in her supervisorial capacity, specifically, her supervision of DA
28  investigators.  See, e.g., Broam v. Bogan, 320 F.3d 1023, 1028 (9th Cir. 2003) (holding

United States District Court
Northern District of California

United States District Court
Northern District of California

"Under Section 1983, supervisory officials are not liable for actions of subordinates on any theory of vicarious liability."  Hansen v. Black, 885 F.2d 642, 645–46 (9th Cir. 1989).  Rather, "each Government official, his or her title notwithstanding, is only liable for his or her own misconduct."  Iqbal, 556 U.S. at 677.

Here, all of the allegations against O'Malley are either conclusory or otherwise inadequate to state a claim based on supervisory liability.  Aside from the above-referenced conclusory allegations (see FAC ¶ 77), the FAC makes several of the same conclusory allegations against O'Malley as against the County (see id. ¶¶ 72–73, 76) and also asserts in conclusory terms that the DA inspectors "acted on behalf of the County and the DA" (see id. ¶ 7) and that O'Malley "ratified . . . violations" in the two above-referenced cases against chiropractors (see id. ¶ 74); Iqbal, 556 U.S. at 678.  The only other allegations naming O'Malley are that she is the "[DA] for the County" (see id. ¶ 7), the "relevant policy maker for and supervisor of the DA inspectors" (see id.), and a "regular invited speaker at AFA" (see id. ¶ 22),[30] none of which suffice to state a claim.[31] See Hansen, 885 F.2d at 646.

Accordingly, plaintiffs' claim against O'Malley is subject to dismissal.

### 3.    Conclusion

For the reasons stated above, the Third Claim is hereby DISMISSED in its entirety, and, in light of the Court's prior directions to plaintiffs regarding amendment of their claims against the County and O'Malley (see May 20 Tr. at 31:23–32:9; 34:4–9),

---

state prosecutors are entitled to absolute immunity when they "engage[] in activities intimately associated with the judicial phase of the criminal process" and to qualified immunity when "performing investigatory or administrative functions") (internal quotation and citation omitted).

[30] The FAC identifies AFA as the Anti-Fraud Alliance, a group that presents conferences in association with, inter alia, the CDAA and DOI.  (See FAC ¶¶ 21–22.)

[31] Other allegations purporting to encompass O'Malley add nothing of substance. See e.g., FAC ¶ 11 (alleging "each [d]efendant was jointly engaged in wrongful activity, and was an integral participant [in] the events and violations"); id. ¶ 12 (alleging "each [d]efendant conspired with each other [d]efendant to violate [p]laintiffs' rights").

such dismissal is without further leave to amend, as it appears plaintiffs have pleaded all the facts they have available at this time.  See Dougherty, 654 F.3d at 901.

**CONCLUSION**

For the reasons stated above,

1.      County defendants' motion to dismiss is GRANTED in part and DENIED in part as set forth above.

2.      Cubangbang's motion to dismiss is GRANTED in part and DENIED in part as set forth above.

**IT IS SO ORDERED.**

Dated: March 6, 2017

MAXINE M. CHESNEY
United States District Judge